**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Civil Action No. 2:19-cv-00506

INTEGRATED COMMUNITY SERVICES
OF PARKERSBURG, INC., formerly known
as Worthington Mental Health Services, Inc.,
and ROGER BRADLEY,

      Defendants.

**MEMORANDUM IN SUPPORT OF MOTION OF THE UNITED STATES
OF AMERICA FOR DEFAULT JUDGMENT AGAINST DEFENDANT
INTEGRATED COMMUNITY SERVICES OF PARKERSBURG, INC.,
<u>FORMERLY KNOWN AS WORTHINGTON MENTAL HEALTH SERVICES, INC.</u>**

## I.  PROCEDURAL BACKGROUND

The Complaint was filed in this civil action on July 10, 2019.  <u>See</u> ECF No. 1.  A summons was issued by the Clerk on July 10, 2019.  <u>See</u> ECF No. 3.  A copy of the summons and complaint was served upon the West Virginia Secretary of State as statutory attorney-in-fact for ICS by the United States.  The West Virginia Secretary of State accepted service of a copy of the summons and complaint on behalf of ICS as statutory attorney-in-fact for receipt of service of process for ICS on July 15, 2019.  The West Virginia Secretary of State filed a return of service with the Clerk which was received by the Clerk on July 19, 2019.  <u>See</u> ECF No. 5.  ICS has failed to appear, plead, or otherwise respond to the Complaint and this civil action within the time required by law, and the time for doing so under Fed.R.Civ.P. 4(h)(1)(B) and Fed.R.Civ.P. 12(a)(1)(A)(i) has now expired.  Pursuant to Fed.R.Civ.P. 55(a), the Clerk of this Court entered a default against ICS on

September 26, 2019, because ICS had failed to appear, answer or plead to the Complaint as required by law.  See ECF No. 10.

Roger Bradley ("Bradley") was served as President of ICS and in his personal capacity on September 4, 2019.  See ECF Nos. 8 and 9.  Bradley has failed to appear, plead, or otherwise respond to the Complaint and this civil action within the time required by law, and the time for doing so under Fed.R.Civ.P. 4(e),(h)(1)(B) and Fed.R.Civ.P. 12(a)(1)(A)(i) has now expired.  A motion for entry of default has been filed with regard to Bradley.  See ECF No. 12.

## II.  FACTUAL BACKGROUND

Prior to March 23, 2006, the United States, through the GSA, owned property identified as the Army Reserve Center, 4200 Emerson Avenue in Parkersburg, Wood County, West Virginia (the "Property"). The property located at 4200 Emerson Avenue, Parkersburg, West Virginia, consists of 3.4 acres of land improved with a 28,820 building and detached garage.

On or about March 23, 2006, the United States of America, through HHS, transferred the Property to Worthington Mental Health Services, Inc., by Quitclaim Deed ("Deed").  Worthington Mental Health Services, Inc. ("WMHS"), subsequently changed its name to Integrated Community Services of Parkersburg, Inc. ("ICS"), and became successor to WMHS and succeeded to WMHS's interest in the Property.

The Deed was recorded in the Wood County, West Virginia, Clerk's Office at Book 1094 and Page 566.  The Property is more particularly described in the Deed as:

> Tract No. A-100 consisting of 3.40 acres fee was acquired from Robert W. and Charles R. Ingram on 10 January 1957, and recorded among the land records of Wood County, West Virginia, in Book 406 of Deeds at page 259 (File No. 33-50-134-1).

See Declaration of Theresa Ritta at Exhibit A at p. 1.[1]

---

[1] The Declaration of Theresa Ritta will hereinafter be referenced as "Ritta Declaration."

2

HHS transferred the Property to WMHS through the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 550, and regulations promulgated pursuant thereto at 45 C.F.R. Part 12, which, among other provisions, allows the transfer of property owned by the United States for the protection of public health, and the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11411, and regulations promulgated pursuant thereto at 45 C.F.R. Part 12a, which, among other provisions, allows the use of public buildings and real property to assist the homeless.

The Deed provides that the Property was subject to each of the following conditions subsequent, among others:

1. That for a period of thirty (30) years from the date hereof the Property herein conveyed will be used continuously for health purposes in accordance with Grantee's approved program of utilization as set forth in its application dated October 13, 2005, and amended November 15 and December 28, 2005, and for no other purpose;

2. That during the aforesaid period of thirty (30) years Grantee will not resell, lease, mortgage, or encumber or otherwise dispose of any part of the Property or interest therein except as Grantor or its successor in function may authorize in writing;

3. Where construction or major renovation is not required or proposed, the Property must be placed into use within twelve (12) months from the date of this Deed: Where construction or major renovation is contemplated at the time of transfer, the Property must be placed into use within thirty-six (36) months from the date of this Deed;

4. That one year from the date hereof and annually thereafter for the aforesaid period of thirty (30) years, unless Grantor or its successor in function directs otherwise, Grantee will file with Grantor or its successor in function reports on the operation and maintenance of the Property and will furnish, as requested, such other pertinent data evidencing continuous use of the Property for the purposes specified in the above-identified application;

5. That during the aforesaid period of thirty (30) years Grantee will at all times be and remain a tax-supported organization or a nonprofit institution, organization, or association exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986, as amended; and

6. That, for the period during which the Property is used for the purpose for which the Federal assistance is hereby extended by Grantor or for

another purpose involving the provision of similar services or benefits, Grantee hereby agrees that it will comply with the requirements of section 606 of the Act (40 U.S.C. § 476); the Fair Housing Act (42 U.S.C. § 3601-19) and implementing regulations; and, as applicable, Executive Order 11063 (Equal Opportunity in Housing) and implementing regulations; Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d to d-4) (Nondiscrimination in Federally Assisted Programs) and implementing regulations; Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) and implementing regulations; the prohibitions against discrimination on the basis of age under the Age Discrimination Act of 1975 (42 U.S.C. § 6101-07) and implementing regulations; the prohibitions against otherwise qualified individuals with handicaps under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and implementing regulations, and all requirements imposed by or pursuant to the regulations of Grantor (45 CFR Parts 12, 80, 84, 86 and 91) issued pursuant to said Acts and now in effect, to the end that, in accordance with said Acts and regulations, no person in the United States shall, on the ground of race, color, national origin, sex, age, or handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under the program and plan referred to in condition numbered 1 above or under any other program or activity of Grantee, its successors or assigns, to which said Acts and regulations apply by reason of this conveyance.

Ritta Declaration Exhibit A at pp. 2-3.

The "approved program of utilization as set forth in its application dated October 13, 2005, and amended November 15 and December 28, 2005," provided that the property to be continually used for the approved program – homeless assistance supportive services, including drop-in center, case management, mental health and substance abuse program, etc. – for a period of 30 years. Under the terms of the Deed, ICS was subject to all of the conditions, covenants, and other requirements contained in the Deed when it became the successor to WMHS. Ritta Declaration at p. 4.

During a site visit in 2011, HHS noted that while ICS was operating a program on-site, the property itself was underutilized. HHS continued to work with the ICS to put the entire property into full use for homeless assistance purposes. In January 2017, with HHS' approval, ICS leased a portion of the property to Recovery Point of Parkersburg ("RPP") to be used as a non-medical,

in-house, detox treatment facility for those suffering from homelessness and substance abuse disorders. *Id.*

Beginning in June 2018, HHS sent ICS via email, notice that it was delinquent in submitting the required CY2017 Annual Utilization Report (AURs). Per the Deed, AURs are required to be submitted each year evidencing continued utilization of the property. HHS was unsuccessful after multiple attempts to reach ICS by telephone and email to collect the required report. *Id.*

In October 2018, HHS attempted to notify ICS, again by email and telephone, that HHS would be conducting a site inspection of the property. After unsuccessful attempts at reaching ICS, HHS contacted RPP, grantee's lessee, to seek information regarding use of the property and point-of-contact information for Mr. Roger Bradley, Executive Director, of ICS. RPP provided information HHS already had on file for the grantee and advised that it had been weeks since they have seen or been able to reach Mr. Bradley. They advised that they made rental payments by texting Mr. Bradley when a payment is ready and that he came to pick-up the check – last being at the end of September 2018. A site visit inspection was scheduled and confirmed with RPP for October 29, 2018. *Id.* at pp. 4-5.

HHS conducted a site inspection on October 29, 2018. While RPP is fully operating its program on the portion of the property it is leasing from the grantee, the portion to be utilized by grantee was vacant and appeared to be for some time. RPP advised that October's rental check was picked up by Mr. Bradley's "friend." Following the site visit, HHS tried to contact Mr. Bradley on his cell phone number provided by Mr. Fulks of RPP. HHS was unable to reach Mr. Bradley, and Mr. Bradley did not return calls placed to his telephone number by HHS. HHS

notified RPP to hold all future rental checks for the benefit of the Federal government while this matter was being investigated.  *Id.* at 5.

HHS also subsequently learned that ICS had rented or leased a portion of the Property to another entity to allow it to store equipment on the property.  That action was without permission of HHS and in violation of the terms and conditions contained in the Deed.  *Id.*

The Deed further states that:

> In the event of a breach of any of the conditions subsequent set forth above, whether caused by the legal or other inability of [ICS], its successors and assigns, to perform any of the obligations herein set forth, [HHS] or its successor in function will, at its option, have an immediate right of reentry thereon, and to cause all right, title, and interest in and to the Property to revert to the United States of America, and [ICS], its successors and assigns, shall forfeit all right, title, and interest in and to the Property and to any and all of the tenements, hereditaments, and appurtenances thereunto belonging;

Ritta Declaration at pp. 4-5; Ritta Declaration Exhibit A at p. 3.

The Deed further states that:

> PROVIDED, HOWEVER, that the failure of [HHS] or its successor in function to insist in any one or more instance upon complete performance of any of the said conditions subsequent shall not be construed as a waiver of or a relinquishment of the future performance of any of said conditions subsequent, but the obligations of [ICS] with respect to such future performance shall continue in full force and effect;

Ritta Declaration at p. 6; Ritta Declaration Exhibit A at p. 3.

The Deed further states that:

> In the event title to the Property or any part thereof is reverted to the United States of America for noncompliance ... [ICS] ... shall be responsible for and shall be required to reimburse the United States of America for the decreased value thereof ... [and] ... [t]he United States of America shall ... be reimbursed for such damage, including such costs as may be incurred in recovering title to or possession of the above-described property, as it may sustain as a result of such noncompliance.

Ritta Declaration at p. 6; Ritta Declaration Exhibit A at p. 5.

On June 13, 2018, HHS notified Roger Bradley, President of ICS that ICS had failed to submit its annual utilization report as required by the Deed and federal law.  Mr. Bradley and ICS were also notified that such non-compliance could result in a noncompliance action which might include reversion of the property to the federal government.  Neither Mr. Bradley nor ICS furnished the required annual utilization report as required by the Deed and federal law.  Ritta Declaration at p. 6.

HHS notified Mr. Bradley and ICS again on August 17, 2018, and September 12, 2018, of ICS's failure to submit its annual utilization report as required by the Deed and federal law.  Mr. Bradley and ICS were also notified that such non-compliance could result in a noncompliance action which might include reversion of the property to the federal government.  Neither Mr. Bradley nor ICS furnished the required annual utilization report as required by the Deed and federal law.  *Id.* at pp. 6-7.

On October 25, 2018, HHS notified Mr. Bradley and ICS by letter (attached as Exhibit B) that HHS had been informed that the Property was not being fully utilized for homeless assistance as required by the Deed and federal law.  Mr. Bradley and ICS were informed that they needed to contact HHS immediately to avoid further administrative action which might include reversion of the property to the federal government.  *Id.* at p. 7.

On April 15, 2019, Mr. Bradley and ICS were notified by letter (attached as Ritta Declaration Exhibit C) that ICS was in noncompliance with the terms of the Deed and federal law and that HHS was taking final administrative action to transfer the Property to another entity as permitted by the terms of the Deed and federal law.  HHS stated that it was exercising its rights under the Deed and federal law and requiring ICS to revert the property.  A quitclaim deed was included with the letter and ICS was directed to sign that quitclaim deed so that the property could

be transferred.  This was a final administrative action by HHS.  Neither Mr. Bradley nor ICS responded to that letter or disputed that final administrative action.  Furthermore, neither Mr. Bradley nor ICS have provided the required quitclaim deed or provided the United States with possession of, or title to, the Property.  Ritta Declaration at p. 7; Ritta Declaration Exhibit C.

Neither Mr. Bradley nor ICS have provided the required quitclaim deed or provided the United States with possession of, or title to, the Property.  HHS wants to continue to have the Property utilized as originally intended by Congress and needs a quitclaim deed to be able to transfer the property to a proper person or entity who will utilize the Property as intended by Congress.  Ritta Declaration at p. 7.

### III. ARGUMENT

The Court should grant judgment in the United States' favor because, under terms of the deed, applicable federal law, and applicable West Virginia the Property reverted to the United States, meaning that the United States now has exclusive title to the Property and the defendants have failed to appear and defend against those claims.

### A.    Title To The Property Has Reverted To The United States Under Applicable Federal Law

In 1987, Congress passed the McKinney-Vento Act to address homelessness.  In particular, Title V of the McKinney-Vento Act, 42 U.S.C. §§ 11411-11412, and its implementing regulations, 45 C.F.R. §§ 12a.1, et seq., provide a comprehensive legal framework for making "unutilized, underutilized, excess or surplus" federal property available for use by representatives of the homeless.  45 C.F.R. § 12a.2(a).  Section 501 of the McKinney-Vento Act creates a process to identify available federal real property, evaluate the property for suitability for use to assist the homeless, and where appropriate, market, evaluate applications, and transfer the property to representatives of the homeless.  The process to identify potentially suitable property begins when,

on a quarterly basis, the United States Department of Housing and Urban Development ("HUD") canvasses the approximately twenty- five federal landholding agencies to collect data on properties that are designated as unutilized, underutilized, excess, or surplus. 42 U.S.C. § 11411(a); 45 C.F.R. § 12a.3. These agencies have twenty-five days from receipt of HUD's quarterly inquiry to provide the requested data. *Id.* Under the statute, as it existed at the relevant time, HUD evaluated the data and published in the Federal Register a description of any available property that is suitable for use as a facility to assist the homeless. 42 U.S.C. § 11411(c); 45 C.F.R. § 12a.8(a).

While HUD is charged with identifying suitable property, HHS is charged with evaluating applications by representatives of the homeless for the use of properties designated as suitable "surplus" federal property. 42 U.S.C. § 11411(e). A state or local government agency, or a private nonprofit organization, which provides services to the homeless, can serve as a representative of the homeless. 42 U.S.C. § 11411(i). A representative of the homeless that is interested in such property must send HHS a written "expression of interest" within a designated time period. 45 C.F.R. § 12a.9(a). Applications must be received by HHS within ninety days after receipt of an expression of interest. 42 U.S.C. § 11411(e)(2); 45 C.F.R. § 12a.9(d). HHS must then "evaluate each completed application within 25 days of receipt and . . . promptly advise the applicant of its decision." 42 U.S.C. § 11411(e)(3); 45 C.F.R. § 12a.9(e)(2). Finally, HHS and GSA are to make the properties identified by HUD available to the homeless by the use of deeds or a lease of at least one year in duration. 42 U.S.C. § 11411(f). The deed transferring property pursuant to the McKinney-Vento Act is required to include such language to ensure that the transferred property is used for its intended purpose and complies with applicable state laws. 40 U.S.C. § 550. To the extent transferred property is not used for its intended purpose, the transferring instrument is to provide that the federal government reserves its pre-transfer interest in the property. *Id.*

The undisputed facts indicate that ICS failed to comply with the conditions subsequent contained in the Deed to the Property.  ICS failed to file required utilization reports, failed to use the property as required by federal law, failed to fully utilize the Property for homeless assistance as required by the Deed and federal, illegally and improperly rented portions of the property for commercial purposes in violation of the terms of the Deed to the Property and federal law and without the  consent of HHS, and failed to turn over the improperly handled and collected rental and other payments to HHS in violation of the terms of the Deed and applicable federal law.  See Declaration of Theresa Ritta at pp. 4-7; Ritta Declaration Exhibits A, B. and C.

ICS was notified of these violations and failed to respond.  HHS demanded that the property be reconveyed back to the United States as required by the condition subsequent in the Deed to the Property.  HHS demanded that ICS reconvey the property to the United States by quitclaim deed as required by the conditions in the Deed and under federal law, ICS failed to execute a quitclaim to return the Property to the United States as required by the Deed and applicable federal and state law.  Ritta Declaration at pp. 4-7; Exhibits A, B, and C to the declaration of Theresa Ritta.[2]  Under the terms of the Deed to the Property and the McKinney-Vento Act, the violations were a failure to meet the conditions subsequent imposed by the Deed and federal law and requires the Property to be reverted back to the United States.  See *United States v. Overcoming Love Ministries*, 2018 WL 4054867 (E.D.N.Y. Aug. 24, 2018).  Since ICS failed to meet these conditions subsequent contained in the Deed and imposed by federal law, the Property reverted back to the United States by operation of law.  *Id.* at \*4 ("Accordingly, the Court finds that Plaintiff did not waive any of the conditions subsequent contained in the Deed.

---

[2] HHS also demanded that ICS pay over the misappropriated funds as well.  However, ICS never paid those funds. Ritta Declaration at pp. 4-7; Exhibit C to that declaration.

The Property therefore reverted to Plaintiff upon Defendant's breach of the Deed's conditions subsequent.").

The reversion of property in this case is also consistent with precedent set by other federal case law as well. In *United States v. Florida*, 482 F.2d 205 (5th Cir. 1973), the federal government transferred property to the State of Florida and required that the property be used exclusively for public park purposes.  482 F.2d at 207. The deed provided that the property would automatically revert to the United States in the event that the property was not used exclusively for public park purposes.  *Id.* When the property was not exclusively used as a public park, the United States brought suit to quiet title. *Id.*  That court found that the United States retained a right of reentry and title to the property reverted to the United States.  *Id.*  The court also found that the defenses of laches, waiver, and estoppel were inapplicable.  *Id.*  The United States brought suit to quiet title and the court declared that because the defendant breached the condition subsequent, the United States had exclusive title to the property.  *Id.* at 210.

Reversion of the property for the defendants' failure to comply with the conditions subsequent is also consistent with West Virginia law.  In *City of Wheeling v. Zane*, 173 S.E.2d 158 (W.Va. 1970), the West Virginia Supreme Court of Appeals held that the failure to use property as required by a deed pursuant to a condition subsequent where a possibility of reverter is retained results in the acquisition of an immediate possessory estate in fee simple to the grantor when the condition subsequent has been breached.  If the property is subsequently taken by eminent domain, then the heirs and successors of the Grantor are entitled to the proceeds of the taking.  *Id.* at 165-66.  See also West Virginia Attorney General Opinion, 56 W.Va. Op.Atty.Gen. 236 (1975) (West Virginia Attorney General opined that "Conveyance for specific

purpose of estate terminable without necessity of reentry vests title in heirs of grantor upon cessation of prescribed condition.").

**B.      The United States Is Entitled To A Delaration by The Court That The United States Has Exclusive Title To The Property**

Under the terms of the Deed to the Property, applicable federal law, and applicable state law, the proper remedy is for the Court to enter an order declaring that the United States has exclusive title to the Property.  <u>See</u> *Overcoming Love Ministries*, 2018 WL 4054867 at *4 ("The Court issues a declaration that Plaintiff United States has exclusive title to the Property.").  Accordingly, the United States requests that the Court enter such an order as part of the relief granted to the United States so that the United States can return the Property to its proper purpose an convey the property to an appropriate entity to carry out the purposes of the McKinney-Vento Act to help the homeless.

## IV. CONCLUSION

The defendants have failed to respond to the Complaint within the time required by federal law and have not contested their violations of the terms of the Deed and applicable federal and state law.  The United States is entitled to a declaration of it has exclusive title to the Property because the defendants have violated the conditions subsequent contained in the Deed and imposed by federal law.  Accordingly, the United States respectfully requests that the Court enter an appropriate order stating that the United States has exclusive title to the Property.

Respectfully submitted.

**MICHAEL B. STUART**
**United States Attorney**


**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
P.O. Box 1713
Charleston, WV  25326
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
Counsel for Plaintiff United States of
America

## CERTIFICATE OF SERVICE

I, Fred B. Westfall, Jr., Assistant United States Attorney for the Southern District of West Virginia, hereby certify that on December 23, 2019, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF MOTION OF THE UNITED STATES OF AMERICA FOR DEFAULT JUDGMENT AGAINST DEFENDANT INTEGRATED COMMUNITY SERVICES OF PARKERSBURG, INC., FORMERLY KNOWN AS WORTHINGTON MENTAL HEALTH SERVICES, INC.** with the Clerk of the Court and also served a copy thereof upon the following statutory attorney-in-fact for Integrated Community Services of Parkersburg, Inc.:

> Integrated Community Services of Parkersburg, Inc.
> c/o West Virginia Secretary of State
> Statutory attorney-in-fact
> Building 1 Suite 157-K
> 1900 Kanawha Boulevard East
> Charleston, WV 25305
> Statutory attorney-in-fact for Integrated Community Services of Parkersburg, Inc.

> Integrated Community Services of Parkersburg, Inc.
> 4200 Emerson Avenue
> Parkersburg, West Virginia 26104
> (last known address)

> Roger Bradley, Individually and as President of Integrated Community Services of Parkersburg, Inc.
> 4200 Emerson Avenue
> Parkersburg, West Virginia 26104
> (last known address)

> **s/Fred B. Westfall, Jr.**
> WV State Bar No. 3992
> Assistant United States Attorney
> Attorney for Defendant United States of America
> P.O. Box 1713
> Charleston, WV 25326
> Phone: 304-345-2200
> Fax: 304-347-5443
> E-mail: fred.westfall@usdoj.gov